[No. C.D. 6869.   En Banc.   May 13, 1982.]

*In the Matter of the Disciplinary Proceeding Against* HUGH W. STROH, *an Attorney at Law.*

NORM MALENG, *Prosecuting Attorney, Petitioner,* WASHINGTON STATE BAR ASSOCIATION, *Respondent.*

*David Boerner, Chief Criminal Deputy, Robert S. Lasnik, Deputy,* and *Norm Maleng, King County Prosecuting Attorney,* pro se, for petitioner.

*Kurt M. Bulmer,* for respondent Bar Association.

*James J. Lamont, Gerald B. Netzky,* and *Hugh W. Stroh,* pro se, for respondent Stroh.

BRACHTENBACH, C.J.—We have been asked to review the actions of the Disciplinary Board in dismissing a complaint against an attorney who has been convicted of a felony. For the reasons set out below, we conclude that the Disciplinary

Board erred. Pursuant to our inherent authority to supervise the practice of law, we have reviewed the record and conclude that attorney Hugh Stroh's actions warrant disbarment. We so order.

These facts are undisputed:

On April 30, 1979, attorney Hugh W. Stroh was convicted of tampering with a witness in violation of RCW 9A.72-.120(1)(a). Tampering with a witness is a class C felony. He was sentenced to 30 days in jail and placed on probation for 3 years. In addition, he was required to pay court costs and a $500 fine, and perform 150 hours of community service. The provisions of the sentence have since been carried out. A notice of appeal by Stroh from the conviction of the crime charged was filed but then withdrawn on November 14, 1980.

The King County Prosecutor, Norm Maleng, filed a formal complaint with the Washington State Bar Association. That organization, aware of the charges against attorney Stroh, had instituted disciplinary proceedings under Discipline Rules for Attorneys DRA 9.1(a) and DRA 1.1(a).

DRA 9.1(a) provides that an attorney who has been convicted of a felony will be automatically suspended until the Board determines the appropriate final disposition of the case.

DRA 9.1(a) states:

An attorney shall be automatically suspended from the practice of law upon his conviction of a felony under either state or federal law, whether such conviction be after a plea of guilty, nolo contendere, not guilty, or otherwise, and regardless of the pendency of an appeal, and upon the filing of a certified copy of such conviction with the Supreme Court. Provided, however, that the Board may recommend to the Supreme Court for final disposition the prevention or termination of the suspension if such Board affirmatively finds that moral turpitude was not in fact an element of the crime of which the attorney was convicted, or if the Board affirmatively finds that there is other good cause for preventing or terminating such suspension. Suspension in this manner shall not be a substitute or alternative for disciplinary

proceedings against said attorney, but such proceedings shall be commenced by the Board upon said conviction, or prior thereto if reasonable cause therefor exists, and shall proceed without regard to said suspension.

Prior to sentencing, Mr. Stroh petitioned the Disciplinary Board pursuant to the provisions of DRA 9.1(a). The Disciplinary Board granted that motion and forwarded a certified copy of the conviction, along with its recommendation, to this court. The recommendation in part stated:

> [T]he Board being fully advised in the premises and finding that there is a question whether moral turpitude is in fact an element of the offense for which Mr. Stroh was convicted and that there is a good cause for preventing Mr. Stroh's suspension and finding that a hearing should be held to determine whether moral turpitude is an element of Mr. Stroh's offense, hereby unanimously
> RECOMMENDS that attorney Hugh W. Stroh not be automatically suspended from the practice of law upon the filing of a certified copy of his conviction with the Supreme Court.

Acting on the assumption that a hearing would be held, we did not respond to the recommendation and Mr. Stroh was not suspended.

While DRA 9.1(a) imposes discipline for the period between an attorney's conviction of a felony and the final disposition of his case, DRA 1.1(a) governs the course of all subsequent disciplinary proceedings. That section requires that a fact–finding hearing be held to investigate the charges.

In felony cases, a hearing panel officer must determine whether moral turpitude was in fact an element of the crime committed and recommend appropriate disciplinary action. An investigative hearing was held and the hearing panel officer filed his findings of fact, conclusions of law, and recommendation concerning Hugh W. Stroh. The hearing panel officer concluded that "Respondent's [Stroh's] conduct in attempting to get a witness to testify falsely violated the commonly accepted standard of good morals, honesty and justice, and involved moral turpitude."

The hearing panel officer then concluded Stroh had violated DRA 1.1(a) in that he had been convicted of a felony involving moral turpitude. Even though the hearing panel officer concluded the risk of recidivism was remote, he felt compelled to recommend, subject to DRA 8.1(a), that Stroh be disbarred because his crime involved moral turpitude.

The findings, conclusions and recommendation of the hearing panel officer were considered by the Disciplinary Board at its January 18, 1980, meeting. The chairman of the Disciplinary Board issued the following order:

> RESOLVED that the Board, having given due consideration to the record, finds that the respondent's acts and conduct in this matter did not involve moral turpitude within the meaning of DR 2–103(A)(3) and DRA 1.1(a).
>
> Accordingly, we hereby strike the conclusions and recommendation of the Hearing Officer and direct that the complaint be dismissed.

Neither notice of the dismissal of the complaint nor a copy of the Board's conclusions was forwarded to this court. Also, the prosecutor was not notified of the dismissal as required by DRA 5.6(m).

On January 13, 1981, when Mr. Stroh requested suspension of his jail sentence, the prosecuting attorney discovered that the Disciplinary Board had dismissed his complaint against Stroh. The prosecuting attorney requested that the Board reconsider the case. After oral presentation by the prosecutor and Mr. Stroh on March 20, 1981, the Board denied the motion to reopen.

The prosecuting attorney seeks review of that denial. He claims that the Disciplinary Board failed to follow the Discipline Rules for Attorneys. He also urges that the Board erred in failing to transmit to this court the record of its dismissal of the complaint against Stroh. The Board erred, argues the prosecutor, because only this court has the authority to dispose of a case in which a member of the bar has been convicted of a felony. Finally he claims the Disciplinary Board committed error of law in violation of its duty under DRA 1.1(a) by striking the conclusions and rec-

ommendation of the hearing panel officer and by dismissing the complaint.

On July 10, 1981, this court issued a show cause order directed to the bar association and Mr. Stroh. Our order contained the following statement:

> That the parties shall file briefs and present oral argument according to a schedule set by the Clerk of the Supreme Court concerning the following issues, and other issues deemed relevant by the parties:
>
> (a) Should the Court take cognizance of this matter either upon the Petition of the Prosecuting Attorney of King County or upon its own motion?
>
> (b) Did the proceedings before the Disciplinary Board and its Order of February 22, 1980, comply with the Discipline Rules for Attorneys (1) as a matter of law and/or (2) as a matter of fact?

At oral argument, attorney Stroh was also allowed to argue the general question of what action this court should take regarding discipline. We therefore decide not only the specific questions stated above, but also the ultimate disposition of the case.

I

■ It is not disputed that this court has the inherent power to promulgate rules of discipline, to interpret them, and to enforce them. *Dodd v. Bannister,* 86 Wn.2d 176, 187, 543 P.2d 237 (1975). When the Disciplinary Board fails to carry out its duties regarding discipline, we will protect the process by exercising our inherent power to review the entire matter. *Moore v. Smith,* 89 Wn.2d 932, 939, 578 P.2d 26 (1978). Because of the serious nature of the crime of which Hugh Stroh has been convicted, the effect the dismissal of the complaint has upon public respect for the legal profession, and the allegation that the Disciplinary Board violated the Discipline Rules for Attorneys by dismissing a complaint involving moral turpitude, this case requires our scrutiny.

## A

Having decided to review the Board's action, we must address the second prong of our order to show cause: Did the proceedings before the Disciplinary Board and its order of February 22, 1980, comply with the Discipline Rules for Attorneys?

We conclude that the Board's interpretation of the Discipline Rules for Attorneys was incorrect. The following discussion should clarify the responsibilities of the Board in future proceedings.

The Disciplinary Board erred initially by striking the findings of the hearing officer and substituting its own conclusion that moral turpitude was not an element of the crime committed by Stroh. This conclusion cannot be reconciled with either the precedents of this court or the facts of this case.

First, the crime of tampering with a witness strikes at the very core of the judicial system and therefore necessarily involves moral turpitude. "This system assumes that litigants, lawyers, and witnesses have but one common goal—the ascertainment of truth." *In re Bucci,* 376 A.2d 723, 727 (R.I. 1977) (Kelleher, J., dissenting to 2–year suspension). An attorney presents his case almost entirely through the testimony of witnesses. Although an occasional witness may perjure him/herself, the presentation of the opponent's other witnesses and effective cross–examination frequently reveals the falsehood before a fraud has been perpetrated upon the court. A witness, tampered with by an attorney, however, becomes much more destructive to the search for truth. That witness, privy to the testimony of other witnesses, can avoid the pitfalls of contradiction and refutation by judicious fabrication.

Vigorous cross–examination may become ineffective as the coached witness would know both the questions and the proper answers. In sum, the legal system is virtually defenseless against the united forces of a corrupt attorney and a perjured witness. Thus, "For an attorney at law to actively procure or knowingly countenance the commission

of perjury is utterly reprehensible." *In re Allen,* 52 Cal. 2d 762, 768, 344 P.2d 609 (1959).

Furthermore, this court has consistently held that subornation of perjury, the previous statutory equivalent of Stroh's crime, involves moral turpitude. *In re Kerr,* 86 Wn.2d 655, 548 P.2d 297 (1976); *In re Caffrey,* 71 Wn.2d 554, 429 P.2d 880 (1967); *In re Bixby,* 31 Wn.2d 620, 198 P.2d 672 (1948).

Finally, Mr. Stroh requested and the jury was instructed that the crime of which Stroh was charged required proof of criminal intent. Thus, by adjudging Hugh Stroh guilty, the jury specifically found that he had acted with the objective of committing a crime, in this case tampering with a witness.

As we observed when Mr. Stroh's criminal charge was before us,

> attempts to influence a witness to change his testimony or to absent himself from a trial or other official proceeding, necessarily have as their purpose and it is their natural tendency to obstruct justice. They are offenses against the very object and purpose for which courts are established.

*State v. Stroh,* 91 Wn.2d 580, 582, 588 P.2d 1182 (1979). In sum, no other conclusion except that moral turpitude was involved can be reached in this case. Consequently, the Disciplinary Board erred in dismissing the complaint against Stroh.

It appears, however, that the Disciplinary Board may have been influenced by Stroh's argument that the jury system simply did not work for him. He argued before this court that

> if you put an attorney in front of a jury you're running a substantial risk; and I told my attorney at that time, I don't think we have a jury, I think we have a firing squad. And that's precisely what we had.

Although these views may be commonly held, they cannot be the basis of a disciplinary decision. To foster respect for our legal system we must assume that the jury acted

properly and treated Stroh as it would any other individual. We cannot ask the public to voluntarily comply with the legal system if we, as lawyers, reject its fairness and application to ourselves.

## B

The Disciplinary Board also erred in failing to bring its dismissal of the complaint against Stroh to this court's attention. This issue is one created by ambiguity in the Discipline Rules for Attorneys. Unlike DRA 9.1(a), which specifically places with this court the ultimate determination that an attorney convicted of a felony may continue to practice law, DRA 1.1(a), the provision governing Stroh's hearing, contains no reference to this court. Furthermore, the provisions referring to dismissal of complaints do not explicitly require that the Board notify the Supreme Court. DRA 5.6(d) states only that:

> If the formal complaint is dismissed or if there is no recommendation of discipline by the Board or if the recommendation is that the respondent attorney be censured or reprimanded or that further proceedings be suspended, and the censure or reprimand or suspension of proceedings is accepted by the respondent attorney, the record of the proceeding shall be retained in the office of the Association.

The bar association interpreted DRA 5.6(d) to allow the dismissal of *any* complaint, even one involving an attorney convicted of a felony. Such an interpretation, though plausible, conflicts with a variety of provisions in the discipline rules that emphasize the Supreme Court's control over serious disciplinary proceedings. For instance, the Supreme Court must approve even a stipulated suspension or disbarment, DRA 3.3; it must be notified if the Board stays a disciplinary action involving suspension, DRA 5.6(i); and it must approve any petition to reinstate a disbarred attorney, DRA 8.6(b).

Consequently, since the Board's action was inconsistent with the general structure of the Discipline Rules for Attorneys which place ultimate authority for serious offen-

ses with this court, we hold that it was error to dismiss this complaint without notifying the court. This conclusion is bolstered by the fact that every attorney who has been convicted of a felony in this state has been disbarred. *See, e.g., In re Krogh,* 85 Wn.2d 462, 536 P.2d 578 (1975). The Disciplinary Board and bar association should have sought review before departing from our precedents.

## C

■ Finally, the Disciplinary Board erred in failing to notify the prosecutor of the dismissal of his complaint. DRA 5.6 requires that the Board notify the complainant of "the final disposition of the complaint." DRA 5.6(m). A reasonable interpretation of DRA 2.7 leads to the conclusion that by notifying the bar association of Mr. Stroh's offense and requesting disciplinary proceedings, the prosecutor became the complainant. The record does not reveal any justification for the Board's failure to notify the prosecutor of the dismissal. Because the other errors discussed above justify our review, we mention this failure merely to emphasize its importance in the disciplinary scheme.

In conclusion, we find that the proceedings before the Disciplinary Board did not comply with the disciplinary rules. The Disciplinary Board erred in law and fact by (1) striking the finding of moral turpitude; (2) dismissing a complaint involving a felony without notifying this court; and (3) failing to notify the complainant of that dismissal.

## II

■ These conclusions, however, do not put an end to our inquiry. Although our show cause order did not specifically address the issue of what disciplinary action should be taken against Stroh, justice to both him and the public demands that we resolve all issues involved in his case. Almost 5 years have passed since the incident which gave rise to Stroh's criminal conviction. He has been subjected to publicity and recently, uncertainty as to the final disposition of his case. Fairness to him requires that we decide this issue as expeditiously as possible. Since oral argument,

Mr. Stroh has supplied us with the transcript of his trial. That and the record before the hearing panel officer are sufficient to determine the appropriate discipline. Since the original fact–finding hearing allowed Stroh to argue the proper discipline, no due process values are implicated by our decision to resolve this issue. Furthermore, public confidence in the system has been severely eroded by the lapse of time involved in this case. Public respect for the legal profession demands the final resolution of this case.

Turning to the issue of appropriate discipline, we must conclude that disbarment is warranted.

Although a per se disbarment rule in attorney discipline cases does not, on balance, serve the ends of justice, the facts of this case do not warrant departure from our previous law.

■ The issue of what is the appropriate discipline in this case raises the greater question—what does the court seek to accomplish by such discipline? We have noted the factors to be considered in *In re Smith,* 83 Wn.2d 659, 663, 521 P.2d 212 (1974):

> In making the ultimate determination as to the measure of disciplinary action, we give consideration to: (a) the seriousness and circumstances of the offense, (b) avoidance of repetition, (c) deterrent effect upon others, (d) maintenance of respect for the honor and dignity of the legal profession, and (e) assurance that those who seek legal services will be insulated from unprofessional conduct.

We discussed above the extremely serious nature of this crime and need not elaborate on that point here. Suffice it to say that even if tampering with a witness were not a felony, the detrimental effect such a crime has upon the judicial system demands close scrutiny.

Although the hearing panel officer made a specific finding that the chance of recidivism in this case was small, we see no evidence except Mr. Stroh's withdrawal from criminal practice to support the argument that he will not repeat this crime. Indeed, his arguments on his own behalf per-

suade one that the same ethical shortcomings that led to his conviction in 1979 may lead to a similar incident.

Mr. Stroh, despite his conviction, refuses to admit that he did anything wrong. During oral argument he referred to his actions as "a simple plea bargaining act." Even if we were to accept Mr. Stroh's representations regarding his good intentions in this matter, it is obvious that Mr. Stroh still cannot distinguish between proper and improper methods of achieving his goals. His continual denial of the fact that his actions were improper is strong evidence of Mr. Stroh's inability to distinguish right from wrong. This ethical shortcoming cannot be tolerated in an attorney. Consequently, *Smith*'s second factor also weighs against Mr. Stroh.

Similarly, factor (c), the deterrent effect upon others, argues in favor of severe discipline in this case. The action we take today serves as notice to members of the legal profession that there is a difference between protecting a client's interests by negotiating a lesser penalty and attempting to escape criminal liability by requesting a police officer to modify his/her testimony. Under no circumstances may *false* testimony knowingly be introduced into a hearing by an officer of the court.

Finally, factors (d) and (e), those aspects of lawyer discipline that are designed to protect the public and preserve the public's confidence in the legal profession, argue most strongly for disbarment in this case. Allowing an attorney who has been convicted of this crime to go undisciplined inevitably erodes the public's confidence in the legal profession and the judicial system.

Lawyers provide the public's chief contact with the law and the judicial system. Because of this position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. CPR EC 1–5. By attempting to tamper with a witness, Mr. Stroh demonstrated not only his disregard for a specific law but also his contempt for the judicial process. We cannot sanction that contempt.

Although it is unfortunate that this matter must be resolved only at this late date, we cannot allow Mr. Stroh's conduct to go undisciplined.

Attempting to tamper with a witness represents a flagrant disregard for the very principles upon which our legal system is grounded and renders an attorney unfit to practice law. We therefore order that the name of Hugh W. Stroh be stricken from the roll of attorneys in this state.

ROSELLINI, STAFFORD, and DORE, JJ., and COCHRAN, J. Pro Tem., concur.

WILLIAMS, J., concurs in the result.

UTTER, J. (dissenting)—I dissent. The order of July 10, 1981, of this court defining the issues to be determined on hearing before us carefully stated what was to be decided. Our show cause order was limited to

> (a) Should the Court take cognizance of this matter either upon the Petition of the Prosecuting Attorney of King County or upon its own motion?
> (b) Did the proceedings before the Disciplinary Board and its Order of February 22, 1980, comply with the Discipline Rules for Attorneys (1) as a matter of law and/or (2) as a matter of fact?

The written briefs filed before this court by the bar association, King County Prosecuting Attorney, and Mr. Stroh make apparent these were the only issues the parties believed were before the court. Our appellate rules and procedures provide for full notice to parties of issues to be determined on an appeal of disciplinary action before our court and an opportunity to present argument on those issues, both by written brief and oral argument. DRA 6.1–6.5; RAP 10.1 *et seq.*, 11.1 *et seq.*

If this court wished to consider whether or not to disbar Mr. Stroh at its hearing, it should and could have said so by directing the responsible parties to address that matter in their briefs and at oral argument. We did not so order, and to consider now the issue of disbarment undermines the most fundamental notions of due process as to notice

and an opportunity to be heard.

Mr. Stroh was forced, without notice, to respond at oral argument before this court to isolated inquiry from two members of the court as to what discipline is appropriate. The majority cannot now assert such conduct is even roughly equivalent to constitutional requirements of notice, opportunity to prepare, brief and argue. Traditionally, we have provided such safeguards in the least important case before us. Federal and state constitutions guarantee due process of law when deprivation of the right to practice a profession is at issue. For this court to provide less is inexcusable when it was our order which defined the issues.

Although we may in extraordinary cases depart from our rules to exercise our inherent power in disciplinary cases, we still must meet constitutionally established minimum due process standards in disbarment cases. *In re Ruffalo,* 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968). If we are supplanting the Disciplinary Board by our novel procedure in this case, we should not overlook that our rules provide an opportunity to argue before this court subsequent to Disciplinary Board action at which time notice and an opportunity to brief and argue the issues are all assured. Failure to provide these same guaranties in our consideration of Stroh's disbarment squarely conflicts with the import of our own rules and *Ruffalo.* The Court there stated:

> Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. *Ex parte Garland,* 4 Wall. 333, 380; *Spevack* v. *Klein,* 385 U. S. 511, 515. He is accordingly entitled to procedural due process, which includes fair notice of the charge. See *In re Oliver,* 333 U. S. 257, 273. It was said in *Randall* v. *Brigham,* 7 Wall. 523, 540, that when proceedings for disbarment are "not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defence." Therefore, one of the conditions this Court considers in determining whether disbarment by a State should be

followed by disbarment here is whether "the state procedure from want of notice or opportunity to be heard was wanting in due process." *Selling* v. *Radford,* 243 U. S. 46, 51.

390 U.S. at 550.

State and federal courts that have considered the issue also have concluded attorney discipline proceedings must comport with due process. *In re Ming,* 469 F.2d 1352 (7th Cir. 1972); *In re Fleck,* 419 F.2d 1040 (6th Cir. 1969); *Hackin v. Lockwood,* 361 F.2d 499 (9th Cir.), *cert. denied,* 385 U.S. 960, 17 L. Ed. 2d 305, 87 S. Ct. 396 (1966); *Chaney v. State Bar of Cal.,* 386 F.2d 962 (9th Cir. 1967), *cert. denied,* 390 U.S. 1011, 20 L. Ed. 2d 162, 88 S. Ct. 1262 (1968); *In re Appeal of Icardi,* 436 Pa. 364, 260 A.2d 782 (1970); *In re Nelson,* 78 N.M. 739, 437 P.2d 1008 (1968). Such due process guaranties are consistent with the broader proposition that any state action encroaching upon one's ability to pursue one's own profession must meet due process standards. *Rodriguez de Quinonez v. Perez,* 596 F.2d 486 (1st Cir. 1979); *Maeda v. Amemiya,* 594 P.2d 136 (Hawaii 1979); *Wolfenbarger v. Hennessee,* 520 P.2d 809 (Okla. 1974); *Endler v. Schutzbank,* 68 Cal. 2d 162, 436 P.2d 297, 65 Cal. Rptr. 297 (1968). While flexibility is allowed courts in shaping disciplinary rules for attorneys, that flexibility is limited by due process. *In re Ming, supra* at 1355–56. There the court found violative of due process an executive committee's suspension of Ming without hearing before his criminal conviction became final. The court stated:

> Both licenses to practice law and welfare payments can be viewed as a type of "new property," Reich, The New Property, 73 Yale L.J. 733 (1964), the deprivation of which has drastic consequences to the individual. It is only fair and just that the Government not subject any person to such a drastic divestment without affording him substantial due process of law. . . .
>
> . . .
> . . . . While in a hearing on a suspension based on a finalized conviction of a misdemeanor, an attorney may

not be allowed to reargue the merits of the conviction, he would seem to have similar interests to those of the parolee, or a person being sentenced for a crime, to some hearing under due process. In such a situation, "a chance to respond" must be equated to "the opportunity to be heard" which necessarily implies a hearing. Appellant was not afforded such a hearing and we find that this denial was a deprivation of due process of law.

469 F.2d at 1355-56.

The majority recognizes that the order of the Chief Justice did not address the issue of what disciplinary action should be taken against Stroh but urges "justice to both him and the public demands that we resolve all issues involved in his case." Majority opinion, at 298. It is incongruous for the majority to assume under the guise of justice, all rudimentary concepts of due process are to be sacrificed in the exercise of this court's inherent supervisorial power in bar discipline cases. Rather than expediting resolution of this case, the majority's holding only ensures an appeal on federal due process grounds to the United States Supreme Court, which will further delay final resolution. Surely neither the public nor Mr. Stroh benefit from such a process. We should instead concentrate on making our own processes and rules more clear, which we are now doing. The same due process standards should apply in this case of great notoriety that would be applied in a case in which there is no public clamor.

Notwithstanding the majority's disregard for due process, there are other reasons why Mr. Stroh should not be disbarred at this time. Although I signed the majority opinion upholding the constitutionality of the statute Mr. Stroh was charged with violating, *State v. Stroh,* 91 Wn.2d 580, 588 P.2d 1182, 8 A.L.R.4th 760 (1979), the questions of the propriety of his criminal conviction have not been heard at the appellate level because Stroh dismissed his appeal in reliance on the Board's dismissal of his disciplinary case under our rules.

As discussed in the majority opinion, the Disciplinary Board, acting under the appropriate rules of court, dis-

missed Mr. Stroh's disciplinary action at its January 18, 1980, meeting. Pursuant to our rules, neither notice of dismissal of the complaint nor a copy of the Board's conclusions were forwarded to the Supreme Court. On November 14, 1980, Mr. Stroh voluntarily dismissed the appeal of his criminal conviction. In oral argument before this court, Mr. Stroh indicated he dismissed the appeal at the request of his partners who believed continuing publicity was damaging to them and with the reasonable expectation, based upon our rules, that no additional disciplinary proceedings would occur.[1] This case is unique in that Mr. Stroh abandoned the possibility of establishing his innocence with the reasonable expectation disciplinary proceedings against him were final.

Much delay, which is not attributable to Mr. Stroh, has already occurred regarding disposition of this case. In the past, we have declined to discipline an attorney even though his conduct would normally justify discipline where undue delay has existed, the attorney's actions since the misconduct were exemplary, and no further action was necessary to protect the public. *See In re McNerthney,* 95 Wn.2d 38, 621 P.2d 731 (1980); *In re Ressa,* 94 Wn.2d 882, 621 P.2d 153 (1980).

Over a year passed from the time the Board dismissed

---

[1]Parenthetically, proposed rules now before this court for lawyer discipline will obviate most of the procedural problems that have arisen in this case. They provide any person filing a complaint alleging lawyer misconduct be advised of the disposition of the complaint. Proposed Rules for Lawyer Discipline 2.9(a)(7). A review committee would be established to serve as ombudsmen overseeing the formal actions of bar counsel, stipulations for suspension, disbarment and investigations of mental or physical inability to continue practice, and to determine, initially, in nonfelony cases, whether a crime is a serious crime. (A new term of art in the rules.) If the crime is found to be "serious" within the meaning of the new rules, state bar counsel would be required to petition the Supreme Court for an order suspending the lawyer during the pendency of disciplinary proceedings. The new rules also require notice to the Supreme Court of the Board's dismissal of disciplinary proceedings based upon a criminal conviction of the lawyer. Therefore, the unusual circumstances in this case will be unlikely to recur if the Supreme Court acts favorably on the proposed rules. Thus, the rule we establish for this case will in all likelihood apply only to the unusual facts of this case.

the complaint (February 22, 1980) until the time the prosecutor attempted to reopen the case (March 18, 1981). Stroh cannot be blamed for the Board's failure to notify the prosecution of its dismissal of the complaint or for the failure of the rules to require notice to this court of such dismissal.

He has satisfied the terms of his criminal sentence by serving 30 days in jail, paying a fine, and performing many hours of community service. He has, as well, been exposed to intense publicity surrounding his transgressions, and his personal and family life have become unsettled. Furthermore, since his charge and conviction, Mr. Stroh has abandoned the practice of criminal law for compelling personal reasons and has limited his practice to business clients. His conduct since his conviction has been spotless and he has retained the confidence of his business clients. The hearing panel found there was little chance of Stroh's recidivism, and his conduct since his crime has confirmed that belief.

In summary, the passage of time, the harm that has already befallen Stroh as the result of his acts, his abandonment of criminal practice and demonstrated rehabilitation, the general agreement that there is little chance of recidivism and, most importantly, Stroh's dismissal of his criminal appeal with the reasonable expectation that disciplinary action had concluded, should compel us to deny the reopening of disciplinary proceedings against him.

Under these circumstances, while the court could exercise its inherent jurisdiction to reopen this case, I believe it should not do so. The further hearings required by due process, which under all previous standards should be given for this court to reexplore the issue of whether or not Mr. Stroh should be disbarred, would only unnecessarily prolong this matter. I would not, however, simply end the matter. To assure the public that Mr. Stroh's conduct will be subject to the highest scrutiny, this court should order that any future allegations of misconduct against him be

referred directly to us. With this condition, I would take no further action at this time.

DOLLIVER, J., concurs with UTTER, J.

Reconsideration denied July 9, 1982.